

**Signed July 03, 2019.**

_____
**Ronald B. King**
**Chief United States Bankruptcy Judge**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| JOHN RUSSELL ULBRICH, | § § | CASE NO. 18-52574-RBK |
| DEBTOR | § | CHAPTER 13 |

## OPINION

The question in this case is whether an assignment of a domestic support obligation caused the claim to become a general unsecured claim rather than a priority claim. Based on the facts in this case, the Court finds that the claim retains its priority status because the assignment was "for the purpose of collecting the debt." *See* 11 U.S.C. § 101(14A)(D).

After more than 14 years of marriage, Brenda Pescini filed a petition for dissolution of marriage between herself and John Ulbrich ("Debtor") in California. On December 4, 2014, the California court entered a judgment for dissolution (the "2014 Judgment"), awarding Ms. Pescini spousal support, including: (1) monthly payments by Debtor of $750.00 to Ms. Pescini until "death

of either party, remarriage, or registration of a new domestic partnership of [Ms. Pescini];"[1] (2) 25% of Debtor's earnings in excess of his base salary; (3) the net cash value of Debtor's retirement account; and (4) $1,800.00, plus interest, for Ms. Pescini's attorney's fees associated with the divorce. Debtor failed to make any payments between the date of the 2014 Judgment and December 5, 2017, when the same California court entered judgment by default against Debtor for unpaid support (the "2017 Judgment"). Debtor again failed to make payments on either judgment.

Four years and two judgments later, Ms. Pescini—still without payment—executed an "Agreement for Assignment" ("Agreement") on July 24, 2018, wherein she assigned the 2014 Judgment to Moorpark Recovery Service LLC ("Moorpark").[2] *See* Claim No. 3-1, Part 2, pp. 1–2. The Agreement includes the following relevant provisions:

- (1) Ms. Pescini agreed to "assign *all* rights, interests in and *title* to the judgment;"

- (2) Ms. Pescini affirmed that, "as *owner* of the JUDGMENT, ASSIGNEE [Moorpark] will be responsible for all expenses for [collection and] related court costs," with Moorpark reserving the right to offset from the total recovery those expenses advanced;

- (3) Ms. Pescini would receive 60% and Moorpark would receive 40% of the net recovery;

- (4) If Moorpark needed to defend or litigate the Judgment, or if Debtor filed for bankruptcy, the split increased to 50-50 between Moorpark and Ms. Pescini;

- (5) Ms. Pescini could not recover directly from Debtor while the Agreement was in effect, unless she informed Moorpark, allowing it to deduct its portion from any direct recovery;

---

[1] Debtor's obligation to make $750.00 monthly payments ceased when Ms. Pescini remarried in March 2016. *See* Pescini Declaration, ECF No. 27, p. 1, ¶ 7.

[2] The Agreement provided to the Court only provides for assignment of "the JUDGMENT, PFL 2012 0304 . . . of December 3, 2014" (i.e., the 2014 Judgment). *See* Claim No. 3-1, Part 2, pp. 1–2. Based on the supporting documentation, including the "Acknowledgements" discussed *infra* and Pescini Declaration, the Court finds that Ms. Pescini also assigned the 2017 Judgment to Moorpark, despite the non-provision of a separate agreement to that effect.

2

- (6) Moorpark would make disbursements to Ms. Pescini according to prescribed rules;

- (7) Ms. Pescini neither owed nor paid a retainer, partial payment, or other consideration to Moorpark before executing the Agreement;

- (8) Ms. Pescini "recognize[d] that ASSIGNEE [Moorpark] has total and exclusive right to enforce the JUDGMENT at his discretion;"

- (9) Moorpark could terminate the Agreement "at any time," by following prescribed notice to Ms. Pescini, "thereby transferring back to JUDGMENT CREDITOR [Ms. Pescini] the JUDGMENT which remains unsatisfied;"

- (10) Ms. Pescini, however, did not receive explicit termination rights in the Agreement;

- (11) Moorpark disclaimed that it "is not a licensed attorney and is not entering into an attorney/client relationship of any kind whatsoever" with Ms. Pescini; and

- (12) Ms. Pescini would file an "Acknowledgement of Assignment of Judgment" in the California Court, "thereby transferring the JUDGMENT to the ASSIGNEE [Moorpark]."

*See* Claim No. 3-1, Part 2, pp. 1–2 (emphasis added).

Ms. Pescini then made two filings with the California Court, each titled "Acknowledgement of Assignment of Judgment," with one acknowledging assignment of the 2014 Judgment to Moorpark and estimating the past-due sum at $36,100.00, and the other acknowledging assignment of the 2017 Judgment to Moorpark and estimating the past-due sum at $46,872.35. *See id.* at pp. 3–4. The Acknowledgements contain nearly identical language, including that Ms. Pescini agreed to "transfer, and assign all title rights, and interest in the within judgment to [Moorpark]," authorized Moorpark "to recover, compromise, settle and enforce said judgment" and "withdr[ew] all right and claim to the same." *Id.*

On October 31, 2018, Debtor filed a voluntary petition in this Court, initiating this

3

bankruptcy case under chapter 13 of the Bankruptcy Code. Moorpark originally filed a proof of claim on November 27, 2018, asserting an unsecured claim for $42,596.32 with priority status as a domestic support obligation (or "DSO") pursuant to 11 U.S.C. §§ 507(a)(1)(A) and 101(14A). *See* Claim No. 2-1. On December 7, 2018, Brenda Pescini filed a nearly identical claim, also for a $42,596.32 unsecured claim with priority status as a domestic support obligation, listing the creditor's name as "Brenda Pescini by Moorpark Recovery Service LLC." *See* Claim No. 3-1.

Debtor objects to Claims No. 2 and 3. First, Debtor asserts the claims are duplicates, improperly labeled if the parties intended Claim No. 3 to amend No. 2. Second, Debtor objects to the purported status of Claim No. 3 as a domestic support obligation because the claim was assigned, which Debtor argues destroyed its priority status under § 101(14A)(D).

In her *Response to Debtor's Objection to Claim [Nos.] 2 & 3* (ECF No. 16), Ms. Pescini first asserts that Claim No. 3 was intended to "amend[] and clarify[]" Claim No. 2. The Court, therefore, will treat Claim No. 3 as superseding Claim No. 2. Second, as to the priority issue, Ms. Pescini asserts that the claim was validly assigned to Moorpark for the purpose of having Moorpark collect. As such, Ms. Pescini maintains that the claim falls within the Code's definition of domestic support obligation in § 101(14A), affording it priority under § 507(a)(1)(A).

## JURISDICTION AND AUTHORITY

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b). This matter arises under the Bankruptcy Code in a bankruptcy case referred to this Court by the Standing Order of Reference in this district. This matter is a core proceeding under § 157(b)(2)(B). Venue is proper under § 1409(a). The Court has authority to enter a final judgment per § 157(b)(1).

## DISCUSSION

Section 507(a) of the Bankruptcy Code provides that certain "expenses and claims have

priority" according to the Bankruptcy Code's prescribed priority scheme. Within that scheme, § 507(a)(1)(A) of the current Code awards the highest priority to:

> Allowed unsecured claims for *domestic support obligations* that, as of the date of the filing of the petition . . . , are owed to or recoverable by a spouse, former spouse, or child of the debtor, . . . without regard to whether the claim is filed by such person or is filed by a governmental unit on behalf of such person, on the condition that funds received under this paragraph by a governmental unit under this title after the date of the filing of the petition shall be applied and distributed in accordance with applicable nonbankruptcy law.

11 U.S.C. § 507(a)(1)(A) (emphasis added). Accordingly, to the extent that the claim qualifies as a domestic support obligation, § 507(a) affords it first-in-line priority.

At first glance, the claim here falls squarely within the Code's definition of a domestic support obligation as:

> (14A) . . . a debt . . . that is—
> (A) *owed to or recoverable by*—
>   (i) a spouse, *former spouse*, or child of the debtor . . . ; or
>   (ii) a governmental unit;
> (B) in the nature of alimony, maintenance, or support . . . of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
> (C) established or subject to establishment before, on, or after the date of the order for relief . . . , by reason of . . . —
>   (i) a separation agreement, divorce decree, or property settlement agreement;
>   (ii) an order of a court of record; or
>   . . .
> (D) *not assigned to a nongovernmental entity*, unless that obligation is *assigned voluntarily* by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative *for the purpose of collecting the debt*.

11 U.S.C. § 101(14A) (emphasis added). Thus, Debtor's *original* obligation to pay spousal support, arising out of the 2014 Judgment (and subsequently the 2017 Judgment for arrears thereon), unquestionably would have qualified as a domestic support obligation. The initial

5

obligation was (1) "owed to" Ms. Pescini, (2) in the nature of spousal "support," (3) pursuant to a valid judgment, entered by the California Court, and, (4) until July 24, 2018, not assigned.

Nevertheless, Debtor argues that Ms. Pescini and her claim surrendered § 507(a) priority status when Ms. Pescini assigned the claim to Moorpark. As support, Debtor correctly asserts that, per § 101(14A)(D), a claim that would otherwise meet the statutory standard for a domestic support obligation loses DSO status by operation of law following assignment to a nongovernmental entity for any purpose other than collection of the debt.

Despite her assignment of the claim to Moorpark, Ms. Pescini argues that the obligation retains first-in-line priority status under the exception in § 101(14A)(D) to the general rule that assignment forfeits priority. She asserts that she voluntarily assigned the claim "for the purpose of collecting the debt," to a nongovernmental entity (i.e., Moorpark), which allows the claim to retain DSO status notwithstanding the statute's general prohibition on assignments.

Accordingly, the purpose of the purported assignment here determines the status of the claim. If Ms. Pescini assigned the claim "for the purpose of collecting the debt," then the claim remains a DSO under § 101(14A) that qualifies for § 507(a)(1)(A) priority. If, however, Ms. Pescini assigned the claim for any other purpose (i.e., a true assignment), then it fails to qualify as a DSO and does not receive § 507(a)(1)(A) priority.

To determine whether the assignment is a true assignment or "for the purpose of collecting," the Court begins with the statute itself. Congress, however, did not define "for the purpose of collecting the debt" nor any of its component words in the Code. When Congress does not define a term in a statutory scheme, the Supreme Court instructs courts to give undefined terms their plain meaning. *See **Lamie v. U.S. Tr.***, 540 U.S. 526, 534 (2004). Further, in interpreting a statute that Congress added to an established scheme, such as § 101(14A) added to the Code in

2005, this Court also presumes that Congress knew of existing pertinent case law when it so added. *See* **Hall v. United States**, 566 U.S. 506, 516 (2012). This Court also draws on the common law, treatises and dictionaries, and common sense to ensure that its reading is actually the "plain and natural reading" of statutory terms. *Id.* at 511.[3] Applying those canons here, the history of the Code's treatment of alimony, support, maintenance, and, now, domestic support obligations offers guidance on how to determine the nature of the claim assignment in this case.

### *1. History of the Code's Treatment of the Domestic Support Obligation.*

Although the pre-BAPCPA Code did not use the phrase domestic support obligation, both former-§ 523(a)[4] nondischargeability and former-§ 507(a)[5] priority provisions provided special treatment for claims in the nature of "alimony to, maintenance for, or support of" a former spouse.[6] As such, pursuant to the pre-BAPCPA Code, claims for alimony (like the claim here) enjoyed

---

[3] The parties spent much of their briefing discussing the effect of California state law on the determination of DSO status. To be sure, although state family law concepts underpin the Code's "domestic support obligation" definition, the DSO itself is a unique creature of bankruptcy law. As such, courts have consistently held that determination of DSO status is squarely a matter of federal, not state, law. *See, e.g.*, **Dennis v. Dennis (In re Dennis)**, 25 F.3d 274, 278 (5th Cir. 1994) (the "ultimate finding of whether [a debt is nondischargeable, as 'defined' by the bankruptcy law] is solely [in] the province of the bankruptcy court") (citations omitted) (alterations in original); **Hutton v. Ferguson (In re Hutton)**, 463 B.R. 819, 828 (Bankr. W.D. Tex. 2011) (Gargotta, J.); **In re Lopez**, 405 B.R. 382, 384 (Bankr. S.D. Fla. 2009) ("[F]ederal law controls" the DSO inquiry. "However, the Court may look to state law for guidance . . . ").

[4] [Former § 523](a) A discharge . . . does not discharge an individual debtor from any debt—
    (5) to a . . . former spouse . . . for alimony to, maintenance for, or support . . . but not to the extent that—
        (A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise (other than debts assigned pursuant to section 402(a)(26) of the Social Security Act, or any such debt which has been assigned to the Federal Government or to a State or any political subdivision of such State).

[5] [Former § 507](a) The following expenses and claims have priority in the following order:
. . .
    (7) Seventh, allowed claims for debts to a . . . former spouse . . . for alimony to, maintenance for, or support of such spouse . . . but not to the extent that such debt—
        (A) is assigned to another entity, voluntarily, by operation of law, or otherwise; or
        (B) includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance or support.

[6] The similarity in language between former-§ 523(a) and former-§ 507(a) led courts to interpret the two sections similarly. By adding § 101(14A) as a generally applicable definition, Congress implicitly blessed the practice of applying identical analyses regarding the nature of a claim as a DSO in both priority and nondischargeability contexts.

nondischargeable and seventh-priority status, *unless* they were assigned.

Under a literal reading of those pre-BAPCPA sections, however, an alimony or support claim *assigned* to a nongovernmental entity (like the claim here), lost both nondischargeable and priority status. The resulting claim was treated as general unsecured, and thus dischargeable, debt.

Courts faced with assignments of family claims, nonetheless, disfavored the harsh consequences following such a literal reading, which would force family claimants who had difficulty collecting past-due support obligations from the debtor into a Morton's Fork: either (a) try (and likely fail) to collect arrears on their own, without the help of a professional collector, but receive priority and nondischargeable status, or (b) assign the claim to a collector, who could achieve a greater return, but forfeit priority and nondischargeable status. *See, e.g.*, *In re Beggin*, 19 B.R. 759, 761 (Bankr. W.D. Wash. 1982) (warning that forcing this choice would "undercut" collection programs by "deterring potential participants who could face loss of their support claims through their spouse's subsequent bankruptcy."). To these courts, such an absurd result would have contravened congressional intent in providing nondischargeable and priority status to family obligations. *See generally* *Sateren v. Sateren (In re Sateren)*, 183 B.R. 576, 581 (Bankr. D. N.D. 1995) (describing § 523(a)(5) as an attempt to "resolve the conflict" between the bankruptcy policy of "fresh start" and the family law policy of "ensuring the necessary financial support for the disadvantaged spouse after the termination of the marriage"). Thus, courts eschewed a literal reading of pre-BAPCPA anti-assignment provisions in §§ 523(a)(5) and 507(a)(7). *See **In re Rios***, 901 F.2d 71, 72 (7th Cir. 1990) ("Section 523(a)(5) has not been read literally by the courts.").

Instead, a vast majority of courts interpreting the pre-BAPCPA Code read limitations on assignment in former-§ 523(a)(5)(A) and former-§ 507(a)(7)(A) as only applying to *true* assignments of family claims, *not* to assignments for the purpose of *collecting* support or alimony

arrears. *See **In re Smith***, 180 B.R. 648, 652 (D. Utah 1995). In the context of child support, for example, assignments made "merely [as] procedures for the orderly and efficient collection of child support on behalf of the custodial parent" were nondischargeable, despite § 523(a)(5)(A), because they "merely facilitate[d] the custodial parent's enforcement of child support rights ***without transferring*** . . . ***beneficial right*** to receive child support." *Beggin*, 19 B.R. at 761 (emphasis added). To these courts, deviation from the Code's literal language more closely aligned with congressional intent. *Id.*; ***Holiday v. Kline (In re Kline)***, 65 F.3d 749, 750–51 (8th Cir. 1995) ("Although statutory exceptions to discharge normally are subject to narrow construction, . . . exceptions from discharge for [family] support deserve a more liberal construction.").

Therefore, if a payee assigned a support claim to some entity, solely for help in collecting arrears thereon, courts held that the claim retained nondischargeable and priority status, pursuant to § 523(a)(5) and § 507(a)(7), respectively. The relevant inquiry thus became whether assignment was (1) "for the purpose of collecting," which retained nondischargeable and priority treatment, or (2) "true" assignment, which became dischargeable and non-priority. *Smith*, 180 B.R. at 652.

To answer that inquiry, courts analyzed "whether or not the nonpaying spouse [would] receive ***any present benefit*** from the payment of the debt." *Id.* (emphasis added) (quoting ***Stranathan v. Stowell (In re Stranathan)***, 15 B.R. 223, 226 (Bankr. D. Neb. 1981)); *see also **Adams v. Council, Baradel, Kosmerl & Nolan, P.A. (In re Adams)***, 254 B.R. 857, 862 (D. Md. 2000). Courts made this determination by analyzing the instrument purporting to assign a claim for indication of the parties' intent to make either a full transfer (true assignment) or a contingency-fee arrangement (assignment for collection). *See Smith*, 180 B.R. at 653.

Under this present-benefit test, courts found "true assignments" when payment of the obligation by the debtor-spouse would have ***never*** "***enhance[d]*** the position" of the ex-spouse or

9

child to whom the obligation was originally due. ***In re Mozingo***, 153 B.R. 276, 278 (Bankr. W.D. Mo. 1993) (emphasis added); *see also* ***Reichurdt v. Cerbello (In re Reichurdt)***, 27 B.R. 751, 753 (Bankr. W.D. Wash. 1983). For example, the *Mozingo* court found a "true assignment" under the present-benefit test when the ex-wife assigned to her attorney, "as and for the partial settlement of his fees," "all [wife's] right, title and interest," in past-due maintenance. 153 B.R. at 277. Because the wife retained no interest—legal or equitable—in the arrears, the court found "no reason to believe that any funds paid by this debtor [would] *ever enhance* the position of the former spouse;" thus, the parties effectuated a true assignment. *See id.* at 277–78 (emphasis added). Similarly, the *Reichurdt* court found a "true assignment" under the present-benefit test when the wife "assign[ed] and transfer[red] together with all her right, title and interest" in $22,200, plus interest, to a nongovernmental collection agency, giving the agency full power to "collect, compromise, sue for and discharge" the debt. 27 B.R. at 752–53. The instrument further provided that, if the wife canceled the agreement at "any time" after the agency began collection work, the wife was required to pay $11,100 (or 50% of support arrears) to the assignee-agency. *Id.* In effect, the court found, the wife irrevocably ***transferred*** a "50% interest in the back support" because such 50% interest "would inure to the collection agency," even if the wife later chose to cancel the assignment. *Id.* at 753. To the court, the fact that the agency would necessarily receive a 50% in the post-due support—rather than 50% in whatever was recovered—coupled with the agency's complete control of the claim, reflected "more than an intent to make a mere assignment for collection purposes only." *Id.* Rather, it was an outright transfer and true assignment of a (now) dischargeable and non-priority claim. *Id.* ("The public policy in favor of the debtor's former spouse and children is only afforded where said parties derive a direct benefit from [payment of the obligation].").

By contrast, an assignment for collection was effectuated when the ex-spouse retained

10

some present right to receive a direct benefit. That is, if the debtor-obligor would have paid on the family obligation (either directly to the ex-spouse or to the assignee collector), and the ex-spouse would have received a benefit from that payment, then the assignment was solely for collection and thus exempted. *See Smith*, 180 B.R. at 653 (citing *Beggin*, 19 B.R. at 761 (holding assignment of support claim to state solely for collection exempt from § 523(a)(5)(A)); and **In re Deblock**, 11 B.R. 51, 54 (Bankr. N.D. Ohio 1981) (holding assignment of support rights to law firm so that firm could collect arrears did ***not*** render the debt dischargeable)).

*Smith* provides the most on-point guidance. *Id.* There, the ex-spouse's child support claim remained nondischargeable because, while the ex-spouse executed an agreement titled as an "assignment," she merely "assigned" the claim to a private agency for the purposes of collection. *Id.* That agreement obligated the agency to: (1) make reasonable efforts to collect "all sums" of past-due child support, to which the agency was given power only to "sue for, collect, . . . [or] enforce collection;" (2) advance costs and fees for services and litigation; and (3) remit to the ex-spouse recovered funds (minus the agency's commission). The agreement obligated the ex-spouse to: (1) pay the agency a $5 retainer; (2) pay the agency 28–33% commission on monies it recovered; and (3) pay legal fees that resulted from ex-spouse's attempts to collect directly from debtor-spouse. *Id.* Additionally, the ex-spouse was not indebted to the agency prior to the agreement, did not receive anything other than her portion of the arrears in return for executing the agreement, and did not pledge anything beyond a $5 retainer fee if she cancelled the agreement. *Id.* Most critically to the court, that agreement allowed the ex-spouse to retain a present benefit from the obligation—if debtor-spouse paid, ex-spouse got paid, even if the money passed through the agency and it took a cut. *Id.* Therefore, notwithstanding the agreement's assignment language, the court determined the ex-spouse's "intent was not to effect the type of assignment anticipated

by § 523(a)(5)(A), but simply to enter into what is essentially a contingency fee arrangement." *Id.*

Subsequent cases reaffirmed the purpose of the "assignment for collection" to facilitate the ability of a spouse- or child-payee to recover from the debtor-spouse. *See Adams*, 254 B.R. at 862. Indeed, cases like *Adams* broadened the scope of permissible assignments by finding an "assignment for collection" when an ex-wife assigned her attorney's fees award to her attorney for collection. *Id.* The court found that the ex-wife retained a present benefit in the form of a "dollar for dollar credit against her account," which "relieved [her] of all liability as to the amount of the assignment." *Id.* at 859. The pre-BAPCPA cases thus offered reprieve to a payee-spouse, who could assign for help with collection an obligation to a collector, who could "accept the assignment without worry that it [would] be discharged in a bankruptcy proceeding." *Id.* at 863.

### 2. *Interpretation of "For the Purpose of Collecting the Debt" in Current § 101(14A).*

Congress clearly signaled an intent to integrate the approach taken in the above line of cases into the Code's treatment of alimony, maintenance, and support claims when it expressly included in the definition of domestic support obligation" those family claims assigned "for the purpose of collecting the debt." § 101(14A). Congressional intent behind the addition of § 101(14A) and additional non-bankruptcy sources further bolster this "plain and natural" reading of "assignment for the purpose of collecting." *See Hall*, 566 U.S. at 511.

Most courts that have interpreted domestic support obligation in post-BAPCPA § 101(14A) have applied pre-BAPCPA standards regarding alimony, maintenance, and support. *See **Hutton v. Ferguson (In re Hutton)***, 463 B.R. 819, 828 (Bankr. W.D. Tex. 2011) (Gargotta, J.) (citing ***In re Andrews***, 434 B.R. 541, 546–47 (Bankr. W.D. Ark. 2010)). Applying the present-benefit test makes particular sense, considering Congress drafted § 101(14A) with pre-BAPCPA cases, like *Stranathan*, *Smith*, and *Mozingo* in mind. *See **Aldrich v. Papi (In re Papi)***, 427 B.R.

457, 462 n.5 (Bankr. N.D. Ill. 2010) (explaining that Congress developed the term "DSO" "from the definition of a nondischargeable debt for alimony, maintenance, and support in former [§] 523(a)(5)"). Congress thus signaled a clear intent to bake the present-benefit standard into the Code by adding "for the purpose of collecting" language from these cases into § 101(14A)(D). *See Andrews*, 434 B.R. at 546–47 (collecting cases discussing similarity in language between former-§ 523(a)(5), case law interpreting it, and current-§ 101(14A) as clear evidence of congressional intent to integrate into the Code rather than overrule those cases); *Hall*, 566 U.S. at 516 ("We assume that Congress is aware of existing law when it passes legislation") (citations omitted).

Additionally, the present-benefit test most closely comports with the common law consensus definition of "assignment for collection." *See* 6 AM. JUR. 2D ASSIGNMENTS §§ 111, 115. American Jurisprudence defines an "assignment for collection" as a "transfer of only legal title for the sole purpose of collecting a debt on behalf of the creditor." *Id.* at § 111. Under that definition, the assignor retains "beneficial or equitable ownership," notwithstanding legal title transferring to the assignee. *Id.* at § 115. Attendant to that equitable ownership is the assignor's right to receive a present benefit following collection. *See id.* Thus, even if an assignment appears "absolute in form," it can still qualify as an assignment "for collection purposes," if the parties present evidence of such an intent with the circumstances surrounding the execution of the assignment. *Id.*

Debtor nevertheless argues for a bright-line approach that, if a collector buys a payee's judgment and executes an assignment, that purchased claim can only qualify as a DSO if the collector takes on some alternative role beyond mere assignee—such as attorney to assignor. Although an assignment for collection creates a fiduciary relationship, it does not necessarily create an attorney-client relationship; nor does it need to, despite Debtor's contention to the contrary. *Compare id.*, *and* 7 CAL. JUR. 3D ASSIGNMENTS § 69 ("assignment for collection cannot

13

be said as a matter of law to create an attorney-client relationship"), *with* D. Br., ECF No. 30, at p. 5. Rather, the assignee in an assignment for collection is fully empowered to execute and collect on the claim, so long as the assignor retains rights of equitable ownership, namely, the right to receive some present benefit. 6 AM. JUR. 2D ASSIGNMENTS §§ 111, 115. Thus, here, as is the case whenever a court must determine whether a claim receives DSO status, "[t]he key is the party to whom the claim is owed," not who holds legal title or nominal ownership. 4 COLLIER ON BANKRUPTCY ¶ 507.03[1] (Richard Levin & Henry J. Sommers eds, 16th ed.).

Accordingly, the present-benefit test as applied in pre-BAPCPA cases most closely comports with the plain language of § 101(14A)(D) and the congressional intent that motivated it.

### 3. *DSO Status of Ms. Pescini's Claim.*

Applying the present-benefit test here, Ms. Pescini retained a present benefit to the claim under the Agreement, assigned the claim "for the purpose of collecting the debt" per the § 101(14A)(D) safe harbor, and thus properly asserted a domestic support obligation. Per the terms of the Agreement, Ms. Pescini retains a present benefit in the claim because, if Debtor pays the claim (through the plan or otherwise, via Moorpark or to Ms. Pescini directly), Ms. Pescini will receive 50–60% of such payment. As in *Smith*, the Agreement effectuates "essentially a contingency fee arrangement" between Ms. Pescini and Moorpark. 180 B.R. at 653. In fact, Ms. Pescini will receive cash as a "benefit" here, which is far more direct a benefit than the account "credit" to the payee-spouse found sufficient as a "present benefit" in *Adams*. *See* 254 B.R. at 862.

Nevertheless, Debtor makes much ado about several of the Agreement's provisions. First, the Agreement purports to assign and transfer "all" Ms. Pescini's rights, interests, and title in the claim to Moorpark. *See* D. Br., ECF No. 30, at p. 5. According to Debtor, a collection agency would not "enter into a transaction making it the owner of the debt . . . merely to [seek] to collect

14

on behalf of another." *See* D. Br., ECF No. 30, at p. 5. As discussed in Section 2 *infra*, however, a hornbook "assignment for collection" separates legal and equitable title, with the former vesting in the assignee (Moorpark) and the latter remaining in the assignor-payee (Ms. Pescini). Moreover, this Court's analysis using the present-benefit test best satisfies the Fifth Circuit's imperative to "place substance over form to determine the true nature and purpose" of a purported DSO claim. ***Joseph v. O'Toole (In re Joseph)***, 16 F.3d 86, 88 (5th Cir. 1994) (citation omitted). If this Court were to adopt Debtor's strict test, looking solely to who holds legal title when determining the nature of an "assignment," it would all but write out the exception in § 101(14A)(D).

Second, the Agreement contains other provisions giving Debtor (and initially this Court) pause—it only details the express cancellation rights of Moorpark without stating whether and how Ms. Pescini can cancel the Agreement, it does not state what specific efforts Moorpark must undertake to collect on the claim, and it provides that 40–50% of the recovery from Debtor on the claim will inure to Moorpark as long as the Agreement is in effect. *See* D. Br., ECF No. 30, at pp. 3–7. While the Court finds the terms of the Agreement somewhat ambiguous, if not strongly pro-assignee, it nevertheless concludes that the parties intended to create an assignment "for the purpose of collecting the debt" on the claim. Unlike the "true assignment" in *Mozingo*, Ms. Pescini did not assign or sell away both legal and equitable title nor was the debt assigned to satisfy some pre-existing debt between the collector (Moorpark) and assignor (Ms. Pescini). *See* 153 B.R. at 277. As such, despite the similarity in language between the assignment in *Mozingo* and the Agreement here,[7] this Court here *does* have "reason to believe that any funds paid by this [D]ebtor will . . . enhance the position" of Ms. Pescini; in fact, it does so in the form of cash. *Id.* at 278.

---

[7] Debtor also submitted a brief *Supplement* (ECF No. 31), wherein he cited ***Knott v. McDonald's Corp.***, 985 F. Supp. 1222, 1225 (N.D. Cal. 1997), *aff'd*, 147 F.3d 1065 (9th Cir. 1998), for the proposition that any assignment using the magic words of "'all right, title and interest' conveys everything that the assignor owned in the thing assigned." The Court again rejects such a literal approach in light of § 101(14A)(D) and the mountain of authority cited above.

*Reichurdt* is likewise distinguishable. There, the assignor irrevocably assigned a 50% interest in the judgment itself, ***not*** in the net recovery on the judgment. *See* 27 B.R. at 752–53. There, regardless of what the assignee did or failed to do, the assignee was entitled to the cash value of 50% of the total judgment if the agreement was ever terminated. *See id.* The parties, thus, permanently deprived the assignor-spouse of any present benefit in that 50% interest, which evinced intent to make a "true assignment" of the claim. *See id.* Here, by contrast, Ms. Pescini could possibly receive a present benefit in the entire amount of the claim. If Moorpark actively terminates the Agreement or allows the Agreement or judgments to expire, the terms of the Agreement specify that legal title re-vests in Ms. Pescini. *See* Claim No. 3-1, Part 2, p. 2. In addition, although the Agreement does not expressly provide that Ms. Pescini can terminate the Agreement, Moorpark judicially admitted in its *Response* that Ms. Pescini "retained the right to terminate at any time." *See* ECF No. 16, p. 2. If either party were to terminate in the future, and Debtor were to make payments on the claim thereafter, then Ms. Pescini would realize 100% of the benefit from such payments. Therefore, unlike the collector in *Reichurdt*, Moorpark reserves nothing under the Agreement should termination occur. *Compare id.*, *with* 27 B.R. at 752–53.

Third, Debtor cites two post-BAPCPA cases as support for the proposition that § 101(14A) excludes "most obligations assigned other than to governmental units." ***Loe, Warren, Rosenfield, Katcher, Hibbs, & Windsor, P.C. v. Brooks (In re Brooks)***, 371 B.R. 761, 768 (Bankr. N.D. Tex. 2007) (Lynn, J.); ***Liberty Acquisitions, LLC v. Cordova (In re Cordova)***, 439 B.R. 756, 760 (Bankr. D. Colo 2010). Although Debtor is partially correct—the DSO definition does exclude *most* assignments to nongovernmental units—the two cases do not actually support his argument against DSO status here. First, in *Brooks*, Judge Lynn used the word "most" when discussing assignments prohibited by § 101(14A)(D), recognizing that the general anti-assignment rule gives

16

way to a specific exception for those assigned "for the purpose of collecting." *See* 371 B.R. at 768.

Second, *Brooks* and *Cordova* are both factually inapposite to the present case. In *Brooks*, the third-party law firm asserting a DSO intervened during the divorce proceeding and obtained two separate awards—one against its client (non-debtor-spouse), one against the adverse party (debtor-spouse). *See* 371 B.R. at 762. The debtor-spouse was not, in any way, liable for the award against the non-debtor-spouse and vice versa. *See id.* Therefore, the court denied DSO status to the law firm's claim. *See id.* at 765. In many ways, however, the result in *Brooks* actually comports with the result in this case. One, the separate award against the debtor-spouse was not a DSO because it had never been, nor would it ever become, "owed to or recoverable by" the non-debtor-spouse, who had no liability on that award. *See id.* Two, the separate award against the non-debtor-spouse could not be a DSO because, even if interpreted as "assigned," the non-debtor-spouse would receive ***no present benefit*** from payment on it by the debtor-spouse. *See id.* In other words, the award against the non-debtor-spouse was not "for the purpose of collecting" a debt owed to the non-debtor spouse—there was never any debt for the non-debtor-spouse to assign. *See id.* Thus both the non-debtor-spouse and debtor-spouse awards fell outside the literal definition of DSO in § 101(14A) and the assignment-for-collection exception in § 101(14A)(D), respectively. By contrast, the entire award here was and still is "owed to" and "recoverable by" Ms. Pescini.

*Cordova* also involves unique facts and is inapposite here. *See* 439 B.R. at 760. The court denied DSO status to a claim originally owed to a "child and family investigator" ("CFI") appointed by the state court during the dissolution of marriage. *Id.* at 757. The CFI incurred fees during dissolution proceedings, which initially gave rise to a DSO claim by the CFI. *Id.* But the CFI subsequently assigned that claim to a third-party collector, who filed a proof of claim in the debtor's case. *See id.* Section 101(14A)(D), however, only carves out assignments for collection

17

*made by* a "spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative." The CFI was "not, therefore, one of the enumerated parties" to which the assignment-for-collection exception applied. *Id.* at 761. Here, however, no party disputes that Ms. Pescini, as a former spouse, had the ability to assign the claim to a third party "for the purpose of collecting." That is exactly what she chose to do here. Accordingly, the claim is a domestic support obligation entitled to first priority per § 507(a)(1)(A). Any plan filed and confirmed in this case must provide for its payment in full pursuant to § 1322(a)(2).[8]

### CONCLUSION

The Debtor's objection to Claim No. 3 of "Brenda Pescini by Moorpark Recovery Services LLC" will be **OVERRULED** for the reasons discussed in this *Opinion*. The Debtor's objection to Claim No. 2 of Moorpark will be **SUSTAINED** because it is a duplicate of Claim No. 3.

This *Opinion* constitutes the findings of fact and conclusions of law of the Court pursuant to FED. R. BANKR. P. 7052 and 9014. A separate order to this effect will be entered.

# # #

---

[8] BAPCPA also created two tranches of DSO priority within § 507(a)(1)(A). *Cf. In re Penaran*, 424 B.R. 868, 876 (Bankr. D. Kan. 2010). If the DSO is "owed to" or "recoverable by" an ***individual*** or ***non-governmental entity***, it falls within § 507(a)(1)(A), and the plan must provide for payment in full pursuant to § 1322(a)(2). If the DSO is "owed to" or "recoverable by" a ***governmental entity***, it falls within § 507(a)(1)(B) and may be paid less than in full per § 1322(a)(4). Because the claim here clearly is not owed to a governmental entity, it does not fall within § 507(a)(1)(B) and, therefore, receives first-tranche first priority under § 507(a)(1)(A).